# EXHIBIT 6

```
            MURPHY - DIRECT - BALDWIN                 125
```

procedure in an effort to obtain Section 13.3
benefits?

A   My feeling is they'd have to give us some
kind of notice, whether that's in the form of a 30C or
a First Report of Injury form or correspondence, a
request, a written request.

Q   What's the first step in the grievance
procedure, if you know?

A   I am not word for word familiar with the
Public Works procedure.  Normally, it's through the
supervisor.

Q   Do you want to review what's been marked as
Exhibit C?   (Counsel handing document to the witness.)

A   (Witness examining document.)   Well, Section
17.2: "A grievance, whenever possible, shall be
resolved within the division where it arises..."  Let
me just read on a little bit further.

       "Any employee having a grievance shall
present such grievance verbally to his superintendent
with or without his association representative.  In
the event the grievance cannot be satisfactorily
settled by his superintendent and/or his association
representative within three working days from the time
it was presented in Step 1, the representative will

```
                                                      125
```

```
            MURPHY - DIRECT - BALDWIN                 126
```

present the Grievance Committee a written detailed
copy of the grievance.  The association Grievance
Committee will then rule on the validity of the
grievance and if it..."

Q   Stop right there.  So, if the case of a
person claiming Section 13.3 benefits -- and I think
this is old testimony here -- we've been over this a
million times -- you issue the Form 43 denial
automatically, right?

A   Correct.

Q   If the person follows the proper step
grievance procedure, they are to make a verbal request
to their supervisor, as you just read?

       MR. HOLCOMB:  Superintendent.

A   Correct.

Q   And then within three days after that
they're required to --

       MR. HOLCOMB:  Three working days.

Q   After three working days they're supposed to
do what?

A   If it's not satisfactorily resolved with the
superintendent within three working days, it's
presented to the Grievance Committee.

Q   Okay.  And it's your testimony, as you sit

```
                                                      126
```

```
            MURPHY - DIRECT - BALDWIN                 127
```

here today that this is what should be done in cases
like Mr. Correia and Mr. Schirillo and Mr. Brenton and
Mr. Bond?

A   When the denial of their contractual
benefits has been issued; yes.

Q   They should go and verbally speak to their
superintendent?

A   Yes.

Q   And then within three working days
thereafter they file a written grievance?

A   If it's not resolved within three days, it's
brought to their Grievance Committee.

       MR. HOLCOMB:  That is the union
       Grievance Committee?

       THE WITNESS:  Correct.

A   The union's Grievance Committee then will
rule on the validity of the grievance and determine if
they want to proceed.

Q   So they have to convince the union's
Grievance Committee of the propriety of their claim
for heart and hypertension benefits under Section
13.3?

A   Correct.  Whatever way they feel they've
been aggrieved.

```
                                                      127
```

```
            MURPHY - DIRECT - BALDWIN                 128
```

Q   I'm saying that in the instance of these
plaintiffs, when their Form 43 was issued, it's the
Town's position, your position on behalf of the Town,
that that's what should have happened?

A   Yes.

Q   So they need to convince the union Grievance
Committee that they have a valid grievance and it
should proceed in the step process?

A   Yes, that's the process.

Q   What's the next step?

A   "The association," meaning the union, "shall
submit such detailed grievance in writing to the
director of Public Works setting forth the nature of
the grievance.  Within five working days after said
director receives such grievance, he shall arrange to
and meet with representatives of the Public Works
Association for the purpose of adjusting or resolving
such grievance."

Q   Continue.

A   "If such grievance is not resolved to the
satisfaction of the Association by the director of
Public Works within seven working days after such
meeting, the Association may present grievance, in
writing, within seven working days thereafter to the

```
                                                      128
```

MURPHY - DIRECT - BALDWIN                              73

2   A   I might have. I generally do.
3   Q   Why is it that you send that to them? Why
4 is it that you include it for their review?
5   A   So that they understand why they would be
6 considering this type of pension request.
7           MR. BALDWIN: Let's take a minute to
8       let her mark this.
9           (Plaintiff(s) Exhibit F for ID: Town
10      of Stratford Interdepartmental Memorandum,
11      dated 4/22/97; 3 pages.)
12  Q   I'm going to show you what's been marked as
13 Exhibit F for ID. (Counsel handing document to the
14 witness.) Tell us if you can identify that for the
15 record.
16  A   (Witness examining document.) This is a
17 memo, dated April 22, 1997, from me to the Disability
18 Review Board members regarding three applications for
19 disability retirement.
20  Q   And two of the three applicants are Randolph
21 Bond and Augusto Correia, two plaintiffs in the
22 action?
23  A   That's correct.
24  Q   Is this an example of one of the summaries
25 that you provide to the Pension Board and Disability

                                                        73

MURPHY - DIRECT - BALDWIN                              74

2 Review Board for their consideration?
3   A   Yes, it is.
4   Q   Can you explain, in the context of this
5 document, why you make reference to Section 13.3 of
6 the Public Works Collective Bargaining Agreement for
7 their consideration?
8   A   Because that is the section of the
9 Collective Bargaining Agreement that allows for
10 providing those members with disability pension
11 benefits based on heart disease or hypertension.
12  Q   Where does it say in Section 13.3 that
13 they're entitled to disability pension benefits?
14  A   Do you have that document? I believe it's
15 under the heading of pension.
16  Q   (Counsel handing document to the witness.)
17  A   (Witness examining document.) Right,
18 Section 13.3 is part of Article 13, which addresses
19 pensions.
20  Q   What about Section 13.3 entitles them to a
21 disability pension? I'm still not clear.
22          MR. HOLCOMB: I'm just going to object
23      because I think you're misstating her
24      testimony.
25          MR. BALDWIN: I'm asking her to clarify

                                                        74

MURPHY - DIRECT - BALDWIN                              75

2       for everybody's sake, including my own.
3   Q   You reference, specifically, Section 13.3?
4   A   Correct.
5   Q   And my question is: How is that relevant to
6 whether or not they get a disability pension?
7   A   It's relevant because it's part of the
8 section that addresses the pension benefits for these
9 members. Because of that inclusion, these employees
10 are entitled to receive disability pension based on
11 heart disease or hypertension in the same manner as
12 police officers and firefighters who would be eligible
13 for a pension.
14  Q   Then I guess you have to explain for us why
15 police and fire are entitled to a disability pension.
16  A   I believe it's outlined in the pension plan
17 itself that police officers and firefighters, if they
18 are disabled due to heart disease or hypertension,
19 it's conclusively presumed to be disability in the
20 line of duty.
21  Q   In compliance with the FOI request, you
22 produced a large stack of documents. To your
23 knowledge, Eileen, are there any instances where the
24 claim for 13.3 benefits were awarded following the
25 step grievance procedures?

                                                        75

MURPHY - DIRECT - BALDWIN                              76

2   A   Not that I can recall.
3   Q   So, in all instances which have gone to the
4 grievance procedure up through arbitration, has the
5 Town always been successful in denying the claim or
6 having it dismissed on the basis of it not being
7 arbitrable?
8   A   In the two cases that I'm aware of, the
9 ruling was that they were not arbitrable.
10  Q   Are those were the cases of Correia and
11 Bond?
12  A   Yes.
13  Q   Any others that came before? Have there
14 been any others?
15  A   I don't recall without researching if any
16 others have gone to arbitration.
17  Q   But there have been other claims that went
18 through the step grievance procedure in pursuit of
19 Section 13.3 benefits?
20  A   I don't recall.
21  Q   Again, for the record, you've never
22 disclosed to employees the appropriate method or
23 process by which they can pursue the Section 13.3
24 benefits; is that correct?
25  A   I don't recall ever --

                                                        76

```
                MURPHY - DIRECT - BALDWIN         5
```

2 are not police or firemen for the Town of Stratford?
3   A   No, I haven't.
4   Q   You have never had your deposition taken for
5 that?
6   A   Not to the best of my recollection.
7   Q   You realize that you're under oath, right?
8   A   Yes.
9   Q   We'll go over some ground rules. If you're
10 unsure of the answer to a question and you don't know,
11 please respond that you don't know. If you do know
12 the answer to the question and you respond, either
13 affirmatively or negatively, or in any manner that you
14 do, it will be assume by everybody who reads this
15 transcript that you understood the question and that
16 that was your answer with no uncertainties associated.
17       MR. HOLCOMB: Of course, her
18       understanding may be different than yours.
19   Q   Let me ask the question again. Have you
20 ever had your deposition taken in regard to this
21 issue; that being Section 13.3 of the Town employees'
22 Collective Bargaining Agreement regarding those
23 employees' entitlement to heart and hypertension
24 benefits?
25   A   I don't recall giving a deposition. I do

```
                MURPHY - DIRECT - BALDWIN         6
```

2 recall testifying at a formal Workers' Comp hearing.
3   Q   In what case was that?
4   A   That was in the case of Bond. Randolph
5 Bond.
6   Q   Any other cases?
7   A   Not that I can recall.
8   Q   First of all, let's start off with your
9 current position with the Town of Stratford.
10   A   My title is insurance coordinator.
11   Q   How long have you been in that position?
12   A   For 17 years.
13   Q   What exactly are the responsibilities of the
14 insurance coordinator for the Town of Stratford?
15   A   I administer the Town self-insured program
16 for Workers' Compensation claims; I also handle auto
17 liability claims; I'm involved in employee safety and
18 health; and I assist the Human Resource Department in
19 tracking employees on long-term sick leave.
20   Q   How long has the Town been self-insured for
21 its Workers' Compensation?
22   A   For at least as long as I've worked for the
23 Town.
24   Q   Do you have a third-party administrator for
25 those claims?

```
                MURPHY - DIRECT - BALDWIN         7
```

2   A   Yes, we do.
3   Q   Who is it today?
4   A   It's Webster Insurance.
5   Q   Who was it before Webster Insurance?
6   A   Prior to Webster. Well, it's the same
7 company; they were known as Mathog and Moniello.
8 Prior to that it was a company named CIRMA.
9   Q   During what period of time was CIRMA the
10 third-party administrator for your Workers'
11 Compensation claims?
12   A   They were our administrator from the early
13 '90s until 2001.
14   Q   Did they also administer your heart and
15 hypertension claims?
16   A   Yes, they did.
17   Q   Are you in charge of the Town's efforts in
18 the administration of the heart and hypertension
19 claims?
20   A   Yes, that's my responsibility.
21   Q   Just as you are responsible for the Town's
22 efforts in the Workers' Compensation claims?
23   A   Yes.
24   Q   How about pensions? Are you responsible for
25 overseeing the administration of pensions for Town

```
                MURPHY - DIRECT - BALDWIN         8
```

2 employees?
3   A   No. There's a Pension Board that oversees
4 pensions.
5   Q   Do you have any role in that?
6   A   I act as a liaison between the Town
7 administration and the Pension Board.
8   Q   Would you elaborate further on what you mean
9 by a liaison?
10   A   If you're asking what do I do, employees
11 give me a copy of their application for pension,
12 whether it's a disability or a regular pension. I
13 forward that on to the Pension Board. For disability,
14 I forward it along with copies of any pertinent
15 medical records.
16   Q   Do you put together the packets of
17 information for the Disability Review Board?
18   A   Yes.
19   Q   Would you explain briefly for us what the
20 makeup of the pension system is here in the Town of
21 Stratford; that is, you mentioned a Disability Review
22 Board and also a Pension Board. Would you explain
23 what those are?
24   A   You mentioned them. There are two boards.
25 The Disability Review Board is compromised of three

```
1              MURPHY - DIRECT - BALDWIN           9
2  people, two physicians and an attorney.  They review
3  any request for a disability pension and make a
4  recommendation to the Pension Board.
5         The Pension Board is comprised of seven
6  members appointed by the Town Council and six employee
7  group representatives.  They make the final decision
8  on whether or not to award a pension to an employee.
9     Q    And they award pensions, both regular
10 superannuation pensions and disability pensions; is
11 that correct?
12    A    Yes.
13    Q    Your role as the liaison is to the Pension
14 Board only?
15    A    Both.
16    Q    Both the Pension Board and the Disability
17 Review Board?
18    A    Correct.
19    Q    And it's your job to put the medical packets
20 together?
21    A    Correct.
22    Q    Does anybody else do that?
23    A    No.
24    Q    Do you also provide any additional
25 information other than just putting together the
                                                    9
```

```
1              MURPHY - DIRECT - BALDWIN           10
2  medical packets?
3     A    I also write a recap of the case.
4     Q    A recap of the case meaning what's being
5  claimed?
6     A    Meaning what's being claimed.  If it's
7  injury, giving the specifics -- how long the person
8  has been employed, the date of the injury, how it
9  happened, what the medical treatment has been, and
10 what medical recommendations have been given with
11 respect to whether or not the person is totally
12 disabled, permanently disabled.
13    Q    Does anybody at the Town of Stratford
14 oversee what you're doing with regard to the Workers'
15 Compensation claims, the heart and hypertension
16 claims, and the pension applications?
17         MR. HOLCOMB:  Objection as to form.  Go
18         ahead.
19    A    I report to the human resources director.
20    Q    Who is the current human resources director?
21    A    Her name is Dorinda Borer.
22    Q    How long has she been in that position?
23    A    She's been here for about a year and a half.
24    Q    And prior to Dorinda Borer, who was in that
25 position?
                                                    10
```

```
1              MURPHY - DIRECT - BALDWIN           11
2     A    His name is Jack Obernessor.
3     Q    How long was Mr. Obernessor in that
4  position?
5     A    About 12 years.
6     Q    Before Mr. Obernessor, who was there?
7     A    Before him, there was a gap of probably six
8  to nine months.  The previous director was named Doug
9  Morensy (phonetic).
10    Q    Now, when you say that he is your
11 supervisor, does that mean that he actually reviews
12 all of your work as it relates to the Workers'
13 Compensation, the heart and hypertension, and the
14 pension applications or pension approval process?
15    A    Yes.
16    Q    He looks over everything?
17    A    Not everything.
18    Q    I'm trying to get an idea of how much
19 involvement he has in those matters, and please excuse
20 me for grouping them all together.  If it's better for
21 you to separate them by Workers' Compensation, for
22 example, and heart and hypertension or separate from
23 pension, please do so.
24    A    Well, you have to separate them because the
25 pension is a separate issue, separate function.  The
                                                    11
```

```
1              MURPHY - DIRECT - BALDWIN           12
2  HR director reviews all of the information that I send
3  out in the pension packet.  A copy goes to the HR
4  director as well as the Town manager.  In terms of the
5  processing of the claims --
6     Q    That was for the pension that you were
7  talking about?
8     A    Right.  In terms of the Workers' Comp and
9  heart and hypertension claims --
10    Q    Let's back up now.  I apologize for
11 interrupting, but I want to stay focused on the
12 pension aspect.
13         When a person applies for a disability
14 pension, disability which arose in the course of their
15 employment with the Town, what happens?  They fill out
16 the application.  Where do they fill out the
17 application?
18    A    They can either get the application in my
19 office or from their representative.
20    Q    Where is the application filed?
21    A    It's returned to me.  A copy comes to me, a
22 copy to their representative, and a copy to their
23 supervisor.
24    Q    And then what happens from there?
25    A    In terms of my handling?
                                                    12
```

MURPHY - DIRECT - BALDWIN                13

Q   In terms of the processing of that application for a work-related disability pension?
A   What I do with it?
Q   Yes.
A   I contact the secretary for the Pension Board and the Disability Review Board, request that they put it on the agenda for the next meeting, then I write up the recap of the case. I pull the file, go through it, write up the recap, copy it, and distribute it to the Board members.
Q   Is the human resource director involved in any of this process, any of these steps?
A   They get a copy of the packet.
Q   Is it fair to say that, more or less, you act autonomously from the human resources director in putting together that information? You don't collaborate with the human resources director, for example, when you're putting together the summary for the Pension Board or the Disability Review Board, do you?
A   Not normally; no.
Q   And then what happens with the application? It goes onto the agenda?
A   Right.

13

MURPHY - DIRECT - BALDWIN                14

Q   Typically, it is referred, in the instance of a work-related disability pension application, to the Disability Review Board?
A   They always go to the Review Board, disability pension application requests. Yes.
Q   And then they review the information and make a recommendation to the Pension Board?
A   Correct.
Q   Are you involved in that process; that is, the process where the matter is presented to the Disability Review Board?
A   Yes.
Q   What is the nature of your participation in that process?
A   Well, it's the same as with pension. They get the exact same packet of information, and I attend the meetings in case they have any questions.
Q   If who has any questions? The Disability Review Board?
A   Yes.
Q   What sort of questions might they ask you that you'd be able to answer that's not already in the packet of information that you've provided them?
        MR. HOLCOMB: Objection as to form. Go

14

MURPHY - DIRECT - BALDWIN                15

ahead.
A   It would depend on the case. They might have a question is someone still working? Are we waiting for any new medical information? Things along that line. They might ask about light-duty provisions in contracts. Those are just some example of things that they might ask.
Q   The Disability Review Board?
A   Yes.
Q   How might that be germane or relevant to their purpose; that is, the provisions of a contract?
        MR. HOLCOMB: Objection as to form.
A   I think you have to ask them.
Q   And then the recommendation is made to the Pension Board following that meeting?
A   Yes.
Q   Does the applicant have the ability to attend the Disability Review Board meeting?
A   Yes.
Q   And then, do they have the opportunity to present information or their claim to that Review Board?
A   It's my understanding that that's at the discretion of the chairman of the Disability Review

15

MURPHY - DIRECT - BALDWIN                16

Board.
Q   How long have you been acting in this role? 17 years, right?
A   Yes.
Q   And then they make a recommendation to the Pension Board?
A   Correct.
Q   What's next in the process? Might there be questions or more information, medical examinations, that sort of thing?
A   At the Disability Review Board level?
Q   Sure. I thought we were through with the Disability Review Board level and what they do, but if there might be some other, please elaborate.
A   Maybe I didn't understand your question.
Q   I'm trying to get a very clear picture for the record as to what the process is when there is an application made for a work-related disability pension. That's why we're here today. So if you would fill in any other areas in the process such as further examinations might be ordered by the Disability Review Board.
        MR. HOLCOMB: Objection as to form. Go ahead.

16

MURPHY - DIRECT - BALDWIN                 17

A   No. They might recommend an additional examination, but they don't have the authority to order one.
Q   So that would be part of the recommendation that's passed on to the Pension Board?
A   Yes.
Q   And then what happens?
A   Then the Pension Board meets and they would review the information, they would review the recommendation of the Disability Review Board, and then ultimately the Pension Board would decide whether or not they want to grant the pension.
Q   Does the Pension Board also take into consideration union contract provisions as it might relate to the disability pension application before them?
        MR. HOLCOMB: Objection as to form.
A   Again, I think you have to ask them. They can look at any information they want to look at.
Q   But you've been doing this for 17 years, right?
A   Yes.
Q   Have you ever seen that happen?
        MR. HOLCOMB: Objection as to form.

17

MURPHY - DIRECT - BALDWIN                 18

A   Have I ever seen them do what?
Q   Review and take into consideration a contract provision and a Collective Bargaining Agreement as part of their deliberations or consideration of a disability pension application that's in front of them.
        MR. HOLCOMB: Objection as to form.
A   I do send them a copy of the section of the Collective Bargaining Agreement that addresses pensions for nonpolice and fire employees.
Q   Would that include instances where they've been presented with Section 13.3 benefits?
A   Yes.
Q   And next in the process? I presume, they vote? Is there anything else that we're missing?
A   No. That's essentially it. The Pension Board does have the authority if they want to send someone for another opinion, so they can do that. Once they have all the information to their satisfaction, they would vote.
Q   Now, if you would explain the processes for the administrating of Workers' Compensation claims. If it's the same for heart and hypertension claims, please let me know.

18

MURPHY - DIRECT - BALDWIN                 19

        MR. HOLCOMB: Objection as to form.
A   The process is that an employee will either submit a First Report of Injury form or a Notice of Claim to me of whatever the injury or illness might be. We review that to see if it meets certain criteria established by the Workers' Comp Commission in terms of what injuries are considered compensable. I discuss them with our claim representatives at Webster.
Q   Or CIRMA, as the case may be, whoever the third-party administrator is, correct?
A   Whoever it might be at the time. That's correct.
Q   At the time of the employment of the four plaintiffs in this case, who was the claims administrator for the Town?
A   I would have to look at the dates to see who was the administrator on each of those files.
Q   When did Webster or Mathog take over the administration of claims for the Town of Stratford?
A   2001.
Q   Now, you say that the notices are sent to you or reviewed by you?
A   They're sent to me and reviewed by me.

19

MURPHY - DIRECT - BALDWIN                 20

Q   Are you the go-to person, for lack of a better phrase, that is, if one is handed to their supervisor, that supervisor is instructed to give it to you?
A   Yes.
Q   You said that you review it to see whether it complies with the Workers' Compensation laws?
        MR. HOLCOMB: Objection as form.
A   Yes, I do.
Q   I'm asking. Is that what you said that you do?
A   Yes.
Q   Do you review that with anyone else?
A   I'll review it with the adjuster assigned to the case.
Q   You have a very good working knowledge of the Workers' Compensation laws having done this for 17 years, don't you?
A   I'm familiar with the laws; yes.
Q   You're familiar with the notice requirements?
A   Correct.
Q   And you're familiar with heart and hypertension benefits?

20

```
 1         MURPHY - DIRECT - BALDWIN         21
 2    A    Yes.
 3    Q    Let me ask you directly.  Did you administer
 4    the heart and hypertension claims in the same way that
 5    you do the Workers' Compensation claims?
 6              MR. HOLCOMB:  Objection as to form.
 7    A    Essentially, it's the same process; yes.
 8    But we also look at that section of the statute,
 9    because there are certain regulations there, too.
10    Q    Now, in the deposition notice you were asked
11    to bring with you certain documents, right?
12    A    Yes.
13    Q    I'm going to hand you this.  Is that a copy
14    of the deposition notice that you received?  (Counsel
15    handing document to the witness.)
16    A    (Witness examining document.)  Yes.  It's
17    just not signed.
18    Q    Is this the original one that you had?
19    A    Yes.
20              MR. BALDWIN:  We'll mark my copy if
21         it's not a problem.
22    Q    Is that an accurate copy of the original
23    that you received?
24    A    It appears to be the same, or a copy of it.
25              MR. BALDWIN:  We'll mark the copy.
                                                       21
```

```
 1         MURPHY - DIRECT - BALDWIN         22
 2         (Plaintiff's Exhibit A for ID:
 3         Re-Notice of Deposition, dated 3/16/04.)
 4    Q    Let me get a little more general background
 5    zeroing in on the Section 13.3 benefits that we've
 6    been referring to this morning.  In your own words,
 7    can you explain what those benefits are?
 8    A    If that's the section of the contract that
 9    we're talking about, that deals with awarding certain
10    benefits to members of several bargaining units.
11    People who are employed at a certain time in the late
12    1970s, it provided them with heart and hypertension
13    benefits, similar to those afforded to police officers
14    and firefighters under Section 7-433(c).
15    Q    Are those claims for benefits filed by
16    employees administered the same way as the 7-433(c)
17    benefits?
18              MR. HOLCOMB:  Objection as to form.
19              MR. BALDWIN:  What's the objection?
20              MR. HOLCOMB:  Administered by whom, for
21         example.  I don't understand your question.
22         I'm objecting because I don't understand.
23              MR. BALDWIN:  That's fine.  You can
24         answer it.
25    A    They are essentially handled in the same
                                                       22
```

```
 1         MURPHY - DIRECT - BALDWIN         23
 2    way.
 3    Q    What's different about them?  How are they
 4    handled differently?
 5              MR. HOLCOMB:  Same objection.
 6    A    They're handled the same way in that we
 7    review the pre-employment physical exam, we review
 8    whether the claim was filed in a timely manner.  The
 9    only difference would be --  It's essentially the
10    same.
11    Q    The heart and hypertension benefits; that
12    is, the 7-433(c) benefits, are asserted and
13    administered in the same manner as the Chapter 568 or
14    Workers' Compensation benefits; is that correct?
15    A    I don't understand your question.
16    Q    I asked you earlier whether heart and
17    hypertension benefits are processed in the same manner
18    as the Workers' Compensation benefits.  I believe your
19    answer was yes, expect that you look to the heart and
20    hypertension statutes for additional information; is
21    that correct?
22    A    Correct.
23    Q    But in terms of the administration of a
24    claim that the claim is filed either through a First
25    Report of Injury or a 30C, and even if it's
                                                       23
```

```
 1         MURPHY - DIRECT - BALDWIN         24
 2    hand-delivered to their supervision, again, you're,
 3    for lack of a better terms, the go-to person and it
 4    comes to you for your review?
 5    A    Correct.
 6    Q    And you review those the same as you would a
 7    Workers' Compensation claim in looking at maybe the
 8    issues of compensability and timeliness of the claim
 9    and that sort of thing?
10    A    Correct.
11    Q    And you will discuss the claim, often times,
12    with the claim administrator for your Workers'
13    Compensation heart and hypertension claims, whether it
14    be Webster Insurance, Mathog & Moniello, or CIRMA?
15    A    Correct.
16    Q    My question is:  Do you do the same thing
17    for applicants for these benefits, the Section 13.3
18    benefits?
19    A    Yes.
20    Q    You do the exact same thing?
21    A    Yes.
22    Q    What do you do if you determine that you're
23    going to deny a heart and hypertension claim?
24              MR. HOLCOMB:  I'm going to object as to
25         form.  Can we go off the record just a
                                                       24
```

MURPHY - DIRECT - BALDWIN      25

2  second?
3      (Off-the-record discussion.)
4      MR. BALDWIN: Good point.
5  Q   When I'm referring to the heart and
6  hypertension benefits, I mean by that, and I hope that
7  you've understood so far, that we're talking about
8  police and fire subject to 7-433(c) of the Connecticut
9  General Statutes as opposed to the special provision
10 of this Collective Bargaining Agreement, Section 13.3,
11 which would provide the same benefits to municipal
12 employees who are not police and fire. Have you
13 understood that so far?
14 A   I don't know that I understood that.
15 Q   Okay. I'm going to keep going anyway.
16 When I asked you about whether the Section 13.3 claims
17 that are filed by Town of Stratford employees, whether
18 they're handled or administered in the same manner as
19 the heart and hypertension benefits, I meant the heart
20 and hypertension benefits under 7-433(c), which is for
21 police and fire. You understood that?
22 A   I understand that now; yes.
23 Q   There's a difference. Anytime I talk about
24 heart and hypertension benefits, I'd like you to think
25 in terms of just police and fire, the statutory

25

MURPHY - DIRECT - BALDWIN      26

2  provisions that grant them those special benefits and
3  not include in your answer the members of the
4  Collective Bargaining Agreement who have the same
5  benefits provided to them under Section 13.3. I guess
6  we're going to call those the Section 13.3 applicants.
7  Is that fair enough?
8  A   Okay.
9  Q   With that said, let me ask the question
10 again. Although I'm repeating myself, I think it's
11 important for the record to go over it again here.
12     Are the Section 13.3 applicants processed
13 in the same manner as the heart and hypertension
14 benefit applicants?
15 A   Yes, they are.
16 Q   When a heart and hypertension claim is filed
17 and you've reviewed it and you come up with no basis
18 for denying it, will you accept the claim without
19 further administrative proceedings?
20 A   No, we don't.
21 Q   Do you automatically deny every such claim
22 that comes in?
23 A   Yes, we do.
24 Q   So that's just an unwritten rule? Or is it
25 a written rule?

26

MURPHY - DIRECT - BALDWIN      27

2  A   That's an unwritten rule. That's been our
3  procedure for a number of years.
4  Q   So even if a heart and hypertension claim
5  comes in after your review that meets all the criteria
6  for compensability, you will nevertheless issue a
7  denial?
8  A   We issue a denial within the 28-day period
9  from when we first receive notice of the claim,
10 because within that 28 days it's practically
11 impossibility to compile all the information that we
12 need to make a determination. So to protect the
13 Town's rights, we do file the denial within the 28
14 days.
15 Q   You're familiar with Statute 7-433(c),
16 correct?
17 A   Yes.
18 Q   Does it say anywhere in that statute that
19 you only have 28 days to accept or deny the case?
20 A   Not in that statute; no.
21 Q   On what basis do you use the 28-day window?
22 A   We use that under Chapter 568.
23 Q   And that's because 7-433(c) claims are
24 legally administered and subject to the same rules as
25 Chapter 528 claims?

27

MURPHY - DIRECT - BALDWIN      28

2  A   That's my understanding. Correct.
3  Q   And that's why they are essentially handled
4  the same; isn't that correct?
5  A   Correct.
6  Q   So, if you'll issue a denial in the heart
7  and hypertension claim and then, after a reasonable
8  period of time of investigation, you come to conclude
9  that it is a compensable claim, what will you do to
10 award those benefits to the applicant?
11 A   At that point an award is issued by the
12 Workers' Compensation Commission.
13 Q   That decision to accept or deny those
14 benefits is one in which you are intimately involved?
15 A   I'm a part of the process.
16 Q   Has there ever been a heart and hypertension
17 claim in the last 15 years where you did not
18 participate in that process?
19 A   A claim for the Town of Stratford?
20 Q   Yes.
21 A   No.
22 Q   A heart and hypertension claim that was
23 accepted without the need for formal hearings in the
24 Workers' Compensation system, voluntarily accepted by
25 the Town of Stratford, has that ever been awarded on a

28

```
1           MURPHY - DIRECT - BALDWIN         29
2  voluntary basis without your approval?
3      A    No.
4      Q    Is it safe to say that the Town of Stratford
5  will not voluntarily accept liability for heart and
6  hypertension claims without Eileen Murphy's approval?
7           MR. HOLCOMB:  Objection to the form.
8      A    Without my input into the matter.
9      Q    But how about without your approval?
10          MR. HOLCOMB:  Same objection.
11     A    I'm part of the process.  There are several
12 of us that are involved in handling those claims.
13 Ultimately, yes, I would give the approval to bring it
14 back to the Town manager for his signature.
15     Q    You just explained a few questions ago how
16 there has never been a claim in the last 15 years that
17 was voluntarily accepted without your approval, and
18 your answer was yes; is that correct?
19     A    That's correct.
20     Q    You say the same thing is true for the
21 Section 13.3 benefits, that they're administered or
22 handled the same way by the Town?
23     A    We use the same criteria to review those
24 claims; yes.
25     Q    When a claim is filed, it goes to you?
                                                  29
```

```
1           MURPHY - DIRECT - BALDWIN         30
2      A    Correct.
3      Q    Do you require the claim to be filed in any
4  particular form?
5      A    It's generally in the form of a First Report
6  of Injury form or a Notice of Claim.
7      Q    A Notice of Claim commonly referred to as a
8  Form 30C?
9      A    Correct.
10     Q    And then a denial will be issued
11 automatically per standard operating procedures for
12 the Town of Stratford?
13     A    Correct.
14     Q    And then you investigate the compensability
15 of the matter?
16     A    Yes.
17     Q    The same manner as you do with heart and
18 hypertension?
19     A    Correct.
20     Q    And you collaborate with the third-party
21 administrator, whoever that may be handling your
22 Workers' Compensation hypertension claims, in the same
23 manner?
24     A    Yes.
25     Q    And then you make a decision as to whether
                                                  30
```

```
1           MURPHY - DIRECT - BALDWIN         31
2  or not you're going to accept or deny the claim?
3      A    Based on the information that we have; yes.
4      Q    In the last 15 years, have you ever
5  voluntarily accepted a claim for those benefits under
6  Section 13.3?
7      A    Yes.
8      Q    When was the last time, to your knowledge,
9  that you voluntary accepted a Section 13.3 claim?
10     A    To the best of my recollection, I would say
11 seven to ten years ago.
12     Q    Do you remember the name of the person?
13     A    There are two individuals who come to mind;
14 one was Michael Bobko, and the other was Edward
15 Yeomans.
16     Q    Could you spell the last names, please?
17     A    Sure.  Bobko is B-o-b-k-o.  And the other
18 was Edward Yeomans, Y-e-o-m-a-n-s.
19     Q    You've been doing this for 17 years.  Are
20 you able to give us an idea of approximately how many
21 claims for Section 13.3 benefits have been
22 administered in the course of your employment for the
23 Town in the last 17 years?
24     A    I don't think I could come up with a number
25 off the top of my head.
                                                  31
```

```
1           MURPHY - DIRECT - BALDWIN         32
2      Q    Besides the two that you just indicated,
3  Mr. Bobko and Mr. Yeomans, that were voluntarily
4  accepted by the Town some seven to ten years ago, have
5  the benefits ever been awarded otherwise?
6           MR. HOLCOMB:  Objection to the form.
7      A    I don't understand the question.
8      Q    It was a lousy question.  Are Mr. Bobko and
9  Mr. Yeomans the only two employees who have ever
10 obtained the Section 13.3 benefits?
11     A    No.
12     Q    Do you recall the names of other individuals
13 who did obtain those benefits?
14     A    I can recall the name of one other
15 individual; his name was Warren Johns.
16     Q    We're going to go back now to the
17 administration of the claims of the Section 13.3
18 benefits.  If a Section 13.3 benefit is to be denied,
19 what happens?  Where does that claim go?  In the heart
20 and hypertension forum, it goes to the Workers'
21 Compensation commission, correct?
22     A    Correct.
23     Q    And in the case of a Section 13.3 claim,
24 where does it go?
25     A    We would notify the claimant.  I'm not sure,
                                                  32
```

```
1              MURPHY - DIRECT - BALDWIN            37
2      A    Yes.
3      Q    Through the exact process that we've
4  described here this morning; that is, in collaboration
5  with the third-party administrator, you looked into
6  the matter and the claims were denied, correct?
7      A    Yes.
8      Q    And we've established that in the heart and
9  hypertension claims, those proceed on to the Workers'
10 Compensation forum for informal hearings, followed by
11 formal hearings, and an ultimate decision by the trial
12 commissioner, if necessary, correct?
13     A    Correct.
14     Q    My question is:  Do the Section 13.3 claims
15 go, likewise, to the Workers' Compensation Commission
16 for informal hearings and then formal hearings and
17 possibly an ultimate decision by the commissioner?
18     A    They can request a hearing with the
19 commissioner.
20     Q    What happens at the point where a hearing is
21 requested?  What position does the Town of Stratford
22 take?
23     A    I don't understand the question.
24     Q    Okay.  I asked before whether Section 13.3
25 benefit claims are administered in the same way as the
                                                   37
```

```
1              MURPHY - DIRECT - BALDWIN            38
2  heart and hypertension claims, and I believe your
3  answer was yes; is that correct?
4      A    Correct.
5      Q    They are not, however, administered the same
6  once they get to the level of the Workers'
7  Compensation Commission.  Would you agree with that?
8           MR. HOLCOMB:  I'm going to object to
9           that.  The questions that you're asking in
10          terms of administration were how she
11          administered those claims.  I'm going to
12          object to the form of your question.  It
13          misstates the prior testimony.  Go ahead and
14          answer.
15     A    So the question is:  How are they
16 administered at the Workers' Compensation Commission?
17     Q    Yes.
18     A    It depends on the commissioner, how they
19 want to handle them.
20     Q    You're familiar with claims that have gone
21 to the Workers' Compensation Commission for Section
22 13.3 benefits, right?
23     A    Yes.
24     Q    I mean, you are the go-to person in these
25 claims for the Town of Stratford, right?
                                                   38
```

```
1              MURPHY - DIRECT - BALDWIN            39
2      A    I handle the claims for the Town; yes.
3      Q    I think in the past it's been described by
4  Mr. Obernessor that you are autonomous in the handling
5  of those claims with respect to decisions being made
6  on behalf of the Town.  Would you agree with that?
7      A    In conjunction -- As I said before, in
8  conjunction with our adjusters; yes.  We are the
9  people who handle the claims.
10     Q    In terms of the person who was there
11 representing and making decisions on behalf of the
12 Town of Stratford, that's you?
13     A    I make the decisions on behalf of the Town
14 of Stratford; yes.
15     Q    And that includes whether or not to take a
16 case to the formal hearing level in a heart and
17 hypertension claim or, for that matter, a claim for
18 Section 13.3 in front of the Workers' Compensation
19 Commission; is that right?
20     A    As I said before, in conjunction with our
21 adjusters.  At that point it would also be based upon
22 the advice of our level recommendation.  Yes, I make
23 the decision.
24     Q    If you know, does the Workers' Compensation
25 Commission have jurisdiction to decide Section 13.3
                                                   39
```

```
1              MURPHY - DIRECT - BALDWIN            40
2  claims?
3           MR. HOLCOMB:  Objection as to form.
4      A    I don't know if they have jurisdiction to
5  administer those claims.
6      Q    Have you ever participated in a case where
7  the administration of a claim in which the Town has
8  made the assertion to the claimant for those benefits
9  that the Workers' Compensation Commission does not
10 have jurisdiction and, therefore, should not hear the
11 case?
12     A    Yeah, we have raised that issue.
13     Q    As a matter of fact, that is what the Town
14 of Stratford does in every such case; is that not
15 correct?
16     A    I don't know that it's been in every such
17 case, but that has been the position that the Town has
18 taken.
19     Q    And you've participated in that decision?
20     A    I've participated in the discussions that
21 resulted in that decision; yes.
22     Q    So a person who is applying for Section 13.3
23 benefits, like the four plaintiffs in this case, are
24 precluded -- at least it's the position of the Town of
25 Stratford -- are precluded from proceeding in the
                                                   40
```

```
                MURPHY - DIRECT - BALDWIN           45
 2    A    I don't know if I gave them that input at
 3  all.
 4    Q    Do you recall the Town of Stratford, through
 5  its counsel, taking the position that their claims
 6  were not arbitrable because they were not filed in a
 7  timely manner pursuant to the grievance step
 8  procedures of the Collective Bargaining Agreement?
 9    A    Yes.
10    Q    And you participated in that position held
11  by the Town?
12    A    No.
13         MR. HOLCOMB:  Objection as to form.
14    Q    Did you participate in taking that position
15  on behalf of the Town?
16         MR. HOLCOMB:  Same objection.
17    A    No, I did not.
18    Q    Did you agree with that position?
19    A    Yes, I agree with that.
20    Q    The people who claim the 13.3 benefits are
21  supposed to be afforded the same benefits and the same
22  manner as police and fire under the heart and
23  hypertension benefits; is that correct?
24    A    It talks about that with respect to pension;
25  yes.
```

```
                MURPHY - DIRECT - BALDWIN           46
 2    Q    What do you mean with respect to pension?
 3    A    I believe it refers to the pension ordinance
 4  when it talks about granting those benefits to
 5  employees.
 6    Q    Maybe now is a good time for us to look at
 7  the language of Section 13.3.  Give me a moment to
 8  find a copy.
 9         MR. BALDWIN:  Off the record.
10         (Off-the-record discussion.)
11    Q    Eileen, I'm going to show you a two-page
12  document.  Tell me if you are familiar with what it
13  is.  (Counsel handing document to the witness.)
14    A    (Witness examining document.)  Yes, I am.
15  This is the cover page of the Public Works contract,
16  dated September 15, 1994, and part of Article 13,
17  Pensions.
18    Q    To your knowledge, is that an accurate copy
19  of the Section 13.3 benefits that we've been referring
20  all morning?
21    A    Yes.
22    Q    For the record, has that provision been
23  changed over the years, and if so, can you tell us
24  when?
25    A    All of the contracts changed language to
```

```
                MURPHY - DIRECT - BALDWIN           47
 2  some extent with regard to pensions.  I don't know
 3  without looking at the current document whether 13.3
 4  has been changed.  I don't think it has.
 5    Q    That language has been in the contract for a
 6  long time; is that correct?
 7    A    Yes.
 8         MR. BALDWIN:  We'll mark that.
 9         (Plaintiff(s) Exhibit B for ID:
10         Photocopy of cover sheet of Public Works
11         Agreement and Article 13 - Pensions; 2
12         pages.)
13    Q    Back to what we were saying before.  It
14  says:  "Effective April 1, 1974, the municipality
15  shall provide all members of the bargaining unit with
16  the hypertension or heart disease benefits mandated
17  for municipal fire and police personnel under P.A. 524
18  under the same terms and conditions as set forth in
19  said Public Act provided, however that any new
20  employee hired on or after November 1, 1978 shall not
21  be eligible for hypertension or heart disease
22  benefits."
23         First of all, do you know what Public Act
24  528 refers to?
25    A    I believe that was the original act that
```

```
                MURPHY - DIRECT - BALDWIN           48
 2  afforded the heart and hypertension to police and
 3  firefighters.
 4    Q    Now codified as what we've referred to as
 5  7-433(c) of the Connecticut General Statutes?
 6    A    That's my understanding.
 7    Q    Are you familiar with the Workers'
 8  Compensation system and the notice requirements,
 9  correct?
10    A    Notice of claim requirements?
11    Q    Yes.
12    A    Yes.
13    Q    Generally speaking, if a person files a
14  claim within one year of the date of the injury or
15  accident, then they've got their proverbial foot in
16  the door and their case cannot be dismissed for it
17  being untimely; is that accurate?
18    A    It's my understanding that an individual has
19  one year from the date of injury to file their Notice
20  of Claim.
21    Q    So long as they do that, their case can't be
22  dismissed for being untimely?
23         MR. HOLCOMB:  Objection as to form.
24    A    If they truly filed within a year from the
25  date of injury, I don't think it could be dismissed
```

MURPHY - DIRECT - BALDWIN    57

(Plaintiff's Exhibit D for ID.
Affidavit Re: Written Policies, dated
7/9/03.)

Q  I'm going to show you what's been marked as Plaintiff's Exhibit D. You'll confirm for the record that that's the affidavit signed by you with the raised seal of a notary on the second page? (Counsel handing document to the witness.)

A  (Witness examining document.) Yes, it is.

Q  The substantive portion of that affidavit, beginning with the paragraph 4, says: "The Town's human resources department is the department charged with the responsibility for the administration of Workers' Compensation and heart and hypertension claims, including claims filed under Section 13.3 of the Stratford Public Works Employees Association, Local No. 134, and the Town Agreement, dated September 15, 1994, Section 13.3 claims. As part of that administration, the human resources department holds the records relating to claims for Section 13.3 benefits for the period from April 1, 1974 to present."

And paragraph 5. "In compliance with paragraph numbered 1 of the Final Decision. I

MURPHY - DIRECT - BALDWIN    58

undertook a review of the records of the department, the Town's Pension Board and the Town's Disability Review Board to determine whether there are any written policies and procedures, formal or informal, for the handling of Section 13.3 claims. There are no written policies or procedures, formal or informal, except as set forth in the pension ordinance and the policy for reporting injury. The following forms are routinely, but not exclusively used, as applicable. First Report of Injury, Workers' Compensation Notice of Claim -- Form 30C, Workers' Compensation denial and application for retirement."

There's no mention, Eileen, of the grievance procedure being the proper method by which members who are entitled the 13.3 benefits are supposed to pursue those benefits, is there?

A  There's no reference here; no.

Q  That's because it's not the proper procedure, is it?

MR. HOLCOMB: Objection as to form.
MR. LASKE: Argumentative.
MR. HOLCOMB: Absolutely.

Q  Let me ask the question. What is the proper procedure for people to pursue benefits? Do you know

MURPHY - DIRECT - BALDWIN    59

how we went through the disability pension application process from beginning to a decision by the Pension Board, and we did the same for Workers' Compensation from application to either voluntary acceptance by the Town or a decision by the Workers' Compensation Commission? How about the 13.3 benefits? Why don't you explain for the record, for the Court's review, the process by which those claims are handled and automatically decided. What procedure is in place by the Town of Stratford?

MR. HOLCOMB: Objection as to compound, but go ahead.

A  The process is that the individual files their either Notice of Claim or their First Report of Injury form, we review it, a denial is issued within the 28-day time frame, and at that point, depending upon the information that we receive from the claimant or through their counsel, at some point in time a decision would be made on whether or not there was any merit to the claim. But it is the claimant's responsibility; it's their burden of proof to prove their claim.

MR. HOLCOMB: Jim, could we stop for just a second.

MURPHY - DIRECT - BALDWIN    60

MR. BALDWIN: Sure.

(Five-minute recess was taken.)

BY MR. BALDWIN:

Q  Picking up where we left off. You said that it is the claimant's burden of proof to prove their claim, right?

A  Yes.

Q  Who do they prove it to?

A  They prove it to the Town's satisfaction.

Q  Can you be more specific? What person or what body of the Town has to be satisfied?

A  It would be myself, the adjuster, and our legal counsel.

Q  And if they don't satisfy you, what is their recommendation? What's their next option?

A  Their option would be to pursue it through the grievance procedure after the denial is issued.

Q  But then the Town takes the position that if they didn't follow the time requirements in the grievance procedure that it's not a timely grievance, not arbitrable, right?

A  Yes.

Q  And that's what happened here, correct, in the case of Mr. Correia and Mr. Bond?

```
1         MURPHY - DIRECT - BALDWIN           69
2    Q    If the person seeking those Section 13.3
3  benefits passed their pre-employment physical and then
4  was diagnosed with hypertension and they were not
5  hired after 1978, would they be entitled to the
6  Section 13.3 benefits?
7    A    They would be eligible to apply for those
8  benefits.
9    Q    What additional factors might there be that
10 would preclude them from being eligible to obtain
11 those benefits?
12   A    They would have to file a timely Notice of
13 Claim.
14   Q    Timely Notice of Claim as you've described
15 previously, a First Report of Injury or a Form 30C,
16 which goes to you?
17   A    Correct.
18   Q    What else?
19   A    They would have to establish a diagnosis of
20 heart disease or hypertension.
21   Q    Same as police and fire, right?
22   A    Yes.
23   Q    Anything else?
24   A    I think that about covers it.
25   Q    And the same as police and fire, if they're
                                                     69
```

```
1         MURPHY - DIRECT - BALDWIN           70
2  able to establish those facts, then the case is
3  voluntarily accepted by the Town?
4    A    It's accepted -- Finding and award is
5  issued by a Commissioner at that point, not a
6  voluntarily agreement.
7         MR. HOLCOMB:  He was referring to
8         Section 13.3 benefits.
9         THE WITNESS:  I'm sorry.
10        MR. BALDWIN:  No, I wasn't.
11   Q    I was referring to heart and hypertension
12 benefits for police and fire.  They get a finding and
13 award?
14   A    Yes.
15   Q    Which is agreed upon between the claimant
16 for those heart and hypertension benefits and the
17 Town?
18   A    At that point it's an award by the
19 Commission.
20   Q    In those instances where it's voluntarily
21 accepted, it's a document which is drafted by
22 agreement of the parties for the commissioner's
23 execution and approval; is that correct?
24   A    That's correct.
25   Q    But the difference for the Section 13.3
                                                     70
```

```
1         MURPHY - DIRECT - BALDWIN           71
2  claimants, according to your testimony today, is that
3  they must also file a grievance within 15 working days
4  of the issuance of that denial.  Is that your
5  position?
6    A    Yes.
7    Q    Is it your claim that that's the same
8  position that the Town has taken in the last 15 years?
9    A    I believe that is consistent with our
10 position.
11   Q    You've always taken that position?
12   A    That's been the Town's position; yes.
13   Q    In the case of Mr. Macuch, do you recall if
14 he was required to file a grievance?
15   A    I don't recall.
16   Q    If I told you that there was no grievance
17 ever filed in the case of Mr. Macuch, wouldn't that be
18 inconsistent with what you just said?
19        MR. LASKE:  Objection to the form.
20   Q    It's your claim, Eileen, under oath, you're
21 saying with certainty that the Town has always taken
22 the position that claimants for Section 13.3 benefits
23 must follow the step grievance procedure in those
24 instances where the Town issues a denial?
25        MR. HOLCOMB:  Objection as to form.
                                                     71
```

```
1         MURPHY - DIRECT - BALDWIN           72
2    Q    Is that your statement?
3    A    It's the Town's policy that those
4  individuals should pursue through the grievance
5  procedure when a denial has been issued.
6    Q    Is that policy written anywhere?
7    A    No.
8    Q    Has that policy been communicated to
9  employees of the Town Stratford in any manner?
10   A    Not to my knowledge.
11   Q    Is it something that you don't explain to
12 anyone or claim --
13        MR. BALDWIN:  Withdrawn.
14        MR. LASKE:  I'm going to object because
15        these are argumentative.  If you want to
16        save it for a closing argument, that's fine.
17        It's like any other right in a contract.
18        Having a closing argument now won't help.
19        If you have a question, Jim, she can answer
20        it.
21   Q    Isn't it true, Eileen, that in the
22 disability pension applications of Mr. Bond and
23 Mr. Correia that you presented to the Disability
24 Review Board members and the Pension Board the
25 applicable 13.3 section for their consideration?
                                                     72
```

|   |   |   |
|---|---|---|
|   | MURPHY - DIRECT - BALDWIN | 177 |

1  
2    Q    Did you conduct a search for those records?  
3    A    I don't maintain those records, the  
4    grievances files. No.  
5    Q    Who maintains the grievance files in the  
6    case of Mr. Bond and Mr. Correia?  
7    A    The grievance files are maintained by the  
8    director of human resources and her assistant.  
9    Q    What office do you work in?  
10    A    I work in human resources.  
11    Q    Do you recall the part of your testimony on  
12    April 2n in which you had mentioned a Mr. Bobko and  
13    Mr. Yeomans?  
14    A    Yes.  
15    Q    Do you recall that you had stated, to the  
16    best of your recollection at that time, that those  
17    individuals had obtained or secured the Section 13.3  
18    benefits through the Town?  
19    A    They received benefits under the supervisors  
20    bargaining unit provision.  
21    Q    They received benefits pursuant to Section  
22    10.2 --  
23    A    Correct.  
24    Q    -- of the supervisors agreement?  
25    A    Yes.

MURPHY - DIRECT - BALDWIN    53

    MR. HOLCOMB: Objection as to form.
A   I don't deny them the right. We raise the issue of jurisdiction. It's up to the commissioner then to rule on that.
Q   To raise that issue is a decision made by the Town and a position asserted by the Town for at least the last 10 years?
    MR. HOLCOMB: Objection as to form.
A   That has been our position.
Q   And that position is one which you have supported in those 10 years?
A   Yes.
Q   You don't necessarily tell applicants for those benefits, the 13.3 benefits, that they should file a grievance, right? You don't go out of your way to tell them where to go or how to secure those benefits if you're denying them, correct?
A   Correct.
Q   It's your opinion that they can file a grievance, right?
A   Yes.
Q   But that's not the Town's position?
    MR. HOLCOMB: Objection as to form.
A   It's my opinion that they can file a

MURPHY - DIRECT - BALDWIN    54

grievance. Anyone can look at their Collective Bargaining Agreement and approach their union grievance committee to explore filing a grievance.
Q   But if they do that and the Town is going to take the position that if they didn't file it within 15 days as opposed to a year, the Town will take the position that that is not arbitrable and, therefore, the claim should be dismissed?
    MR. HOLCOMB: Objection as to form.
    MR. LASKE: Objection. It's compound.
A   I don't understand the question.
Q   Are the claims for 13.3 benefits pursued pursuant to the grievance procedures handled under the same terms and conditions as set forth in 7-433(c) of the Connecticut General Statutes, heart and hypertension?
    MR. LASKE: Objection.
    MR. HOLCOMB: Objection as to form.
A   I don't think I understand the question. I'm sorry.
Q   Section 13.3 says that those claims should be provided to members of the bargaining unit under the same terms and conditions as set forth in Public Act 524, the heart and hypertension statute, right?

MURPHY - DIRECT - BALDWIN    55

A   That's what it says; yes.
Q   And it's your job to administer those claims, correct?
A   Yes.
Q   Do you administer them under the same terms and conditions as set forth in the heart and hypertension statutes?
A   Under the heart and hypertension and under 568; yes.
Q   You do?
A   Yes.
Q   And that includes the timeliness issues with respect to filing a claim for heart and hypertension pursuant to Section 13.3 within one year from the injury or accident. Yes?
A   Yes.
Q   In the Workers' Compensation system, can you deny a claim for heart and hypertension benefits on the basis that an appeal was not made within 15 days of the issue of a denial of that claim for benefits?
A   I don't understand the question.
Q   Under the heart and hypertension statutes, can the respondent, the employer, in this case the

MURPHY - DIRECT - BALDWIN    56

Town of Stratford, succeed in that Workers' Compensation forum where those claims are administered with denying the claim on the basis that an appeal was not taken within 15 days after the issuance of a denial?
    MR. HOLCOMB: Objection as to form.
A   I'm sorry, I still don't understand your question.
Q   You do.
    MR. HOLCOMB: Objection.
    MR. BALDWIN: I apologize.
    MR. HOLCOMB: Motion to strike.
BY MR. BALDWIN:
Q   I'll try it again. The grievances which were dismissed by the arbitration panel on the basis of the Town bringing up the question of arbitrability in the case in Mr. Correia and Mr. Bond --
    MR. BALDWIN: Withdrawn.
Q   You participated in complying with the Freedom of Information request filed by myself with the Town of Stratford?
A   Yes, I did.
    MR. BALDWIN: Would you mark that, please?

MURPHY - DIRECT - BALDWIN                                    147

1   that covered Mr. Bond and Mr. Correia.
2       Q    What union was he a member of that was
3   different?
4       A    Mr. Brenton was a member of the supervisors
5   union.
6       Q    And they have a different Collective
7   Bargaining Agreement with the Town of Stratford?
8       A    Yes.
9       Q    And that Collective Bargaining Agreement,
10  however, provided similar benefits to those provided
11  pursuant to Section 13.3 of the Collective Bargaining
12  Agreement that Mr. Bond and Mr. Correia and
13  Mr. Schirillo were members of?
14      A    Yes.
15      Q    Did you include in the production of
16  documents, pursuant to our request, records of
17  individuals who were members of the supervisors
18  union --  Is that it?
19      A    Supervisors union.
20      Q    -- who similarly claimed benefits, those
21  benefits which are similar to 13.3?
22      A    I don't recall.  That was done quite some
23  time ago.
24      Q    Are you a member of the same supervisors